UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**ORIGINAL**
Đ ? F

-----------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

KENNETH MCGRIFF, EMANUEL
MOSLEY, DENNIS CROSBY, VICTOR
WRIGHT, NICOLE BROWN, and VASH-TI
PAYLOR,

              Defendants.

**AMENDED MEMORANDUM
AND ORDER**
Case No. 04-CR-966 (S-5)

-----------------------------------------------------x

**BLOCK, Senior District Judge:**

In this multi-defendant prosecution, the Government alleges that defendants

Kenneth McGriff ("McGriff"), Dennis Crosby ("Crosby"), Victor Wright ("Wright"), Nicole

Brown ("Brown") and Emanuel Mosley ("Mosley") were all part of "a criminal

organization . . . whose members and associates engaged in acts of murder, narcotics

trafficking and money laundering." [Fifth] Superseding Indictment ¶ 1. Based on their

alleged roles in the organization, they are statutorily eligible for the death penalty.[1] On

March 22, 2006, the Government gave each of them a notice of its intent to seek the death

penalty ("death-penalty notice"). The death-penalty notices came on the eve of trial, which

was scheduled to begin on April 3, 2006; Chief Judge Korman set this trial date on January

26, 2006, and I adhered to it after the case was reassigned to me.

On March 23rd, the defendants jointly moved to strike the death-penalty

notices because they were not filed "a reasonable time before the trial," as required by 18

---

[1]The sixth defendant, Vash-Ti Paylor, who was not eligible for the death penalty, has pleaded guilty pursuant to a plea agreement. "Defendants" hereafter refers to the five other defendants.

U.S.C. § 3593(a). The Court adjourned the trial date to April 17th for the sole purpose of allowing the parties time to brief the motion and for the Court to render its decision. On April 4th, the Government withdrew its death-penalty notices against all defendants except McGriff, who consequently remains the sole movant. At oral argument on April 7th, the Court denied McGriff's motion and stated that a written opinion would follow.

## BACKGROUND

### A. Anatomy of a Death-Penalty Case

#### 1. The Statutory Framework

The Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-98 ("the Act"), authorizes the death penalty for treason, espionage, and "any other offense for which a sentence of death is provided [by statute]." *Id.* § 3591(a).[2] Before the death penalty can be imposed, however, a jury must find, beyond a reasonable doubt, that one or more of 16 aggravating factors listed in the statute is present. *See id.* § 3592(c). In making its death-penalty decision, the jury may also consider "any other aggravating factor for which notice has been given," *id.*, and *must* consider "any mitigating factor." *Id.* § 3592(a).

The Act contains the following notice provision:

> If, in a case involving an offense [eligible for the death penalty], the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, *a reasonable time before the trial or before acceptance by the court of a plea of guilty*, sign and file with the court, and serve on the defendant, a notice—

---

[2]In addition, the Anti-Drug Abuse Act of 1988 contains its own death-penalty provision for murders committed in the course of certain drug offenses, *see* 21 U.S.C. § 848(e-r); that statute is not implicated here.

> (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
>
> (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

*Id.* § 3593(a) (emphasis added).

## 2. *The Decision-Making Process*

The decision whether to seek the federal death penalty unfolds in two stages. At the first stage, the United States Attorney ("U.S. Attorney") initiating the prosecution makes a recommendation to the Attorney General as to whether or not the Attorney General should authorize a death-penalty prosecution. At the second stage, the Attorney General processes the recommendation and makes the ultimate decision. The Attorney General has established protocols to be followed at both stages. *See* United States Department of Justice ("DOJ"), United States Attorneys' Manual ("USAM"), §§ 9-10.010 to 9-10.120, *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/index.html (last visited Apr. 11, 2006).

## a. First Stage

The first stage begins pre-indictment; the U.S. Attorney should, "whenever possible, make a preliminary decision whether to request authorization to seek the death penalty before obtaining an indictment charging a capital offense." *Id.* § 9-10.020. Moreover, if the indictment, once obtained, charges a violation of 18 U.S.C. § 1959 (which makes murder in aid of racketeering a capital offense), it must be submitted for review to

DOJ's Criminal Division before it is filed, *see id.*; for all other death-eligible offenses, the U.S. Attorney is "encouraged, but not required, to consult with DOJ's Capital Case Unit and other appropriate sections of the Criminal Division" before filing the indictment. *Id.*

The Attorney General's protocols further require that before the U.S. Attorney makes his or her final decision, the defendant shall have "a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration." *Id.* § 9-10.030.[3] The protocols do not otherwise instruct the U.S. Attorney how to proceed. According to the Assistant United States Attorney ("AUSA") assigned to this case, the U.S. Attorney's Office for the Eastern District of New York presents the facts underlying a death-eligible case to a Death Penalty Committee, and defense counsel is invited to submit mitigation statements to this committee.

Whether the Death Penalty Committee makes a recommendation to the U.S. Attorney or simply works up the case is unclear, but the fruits of its efforts are submitted to the U.S. Attorney, after which she makes her recommendation to the Attorney General. Neither the work-product of the Death Penalty Committee nor the U.S. Attorney's recommendation is disclosed to the defendants or the Court.

If the U.S. Attorney recommends the death penalty, the Attorney General's protocols require submission of a "Death Penalty Evaluation" form and a memorandum outlining the prosecution, along with "copies of all existing, proposed, and superseding indictments, a draft notice of intention to seek the death penalty, any information

---

[3]By this point in the proceedings, the defendant is represented by two attorneys, one "learned in the law of capital cases." 18 U.S.C. § 3005.

concerning the impact on the victim's family, and any written material submitted by counsel for the defendant in opposition." *Id.* § 9-10.040. These materials are to be submitted "[no] later than 45 days prior to the date on which the Government is required, by an order of the court or otherwise, to file notice that it intends to seek the death penalty." *Id.*

If the U.S. Attorney's recommendation is that the death penalty should not be sought, the protocols require only "a Death Penalty Evaluation form that contains a brief statement of the reason the United States Attorney decided not to seek the death penalty," *id.*; it "should be completed and forwarded to the Criminal Division before or as soon as possible after indictment." *Id.*

### b. Second Stage

The second stage of the decision-making process begins upon receipt of the U.S. Attorney's recommendation. The Attorney General's Review Committee on Capital Cases ("Attorney General's Committee") reviews the U.S. Attorney's submissions. *See id.* § 9-10.050. The defendant's attorney is "provided an opportunity to present to the committee the reasons why the death penalty should not be sought." *Id.*

"After considering all information submitted to it, the [Attorney General's] Committee . . . make[s] a recommendation to the Attorney General," who then renders "the final decision." *Id.* If the decision is to seek the death penalty, the U.S. Attorney then files a death-penalty notice, which must identify (1) the charges for which the death penalty is sought, and (2) the factors, both statutory and non-statutory, that the Government intends to prove at trial to warrant the imposition of the death penalty. *See* 18 U.S.C. § 3593(a).

As evidenced by the Government's decision to withdraw the death-penalty notices against McGriff's co-defendants, the decision to seek the death penalty is subject to reconsideration. *See* USAM §§ 9-10.055 ("Subsequent to the initial Department of Justice review, the United States Attorney and the Attorney General's Committee shall review any submission defense counsel chooses to make.") & 9-10.090 (providing procedures for withdrawal of notice of intent). By the same token, the protocols do not foreclose the Attorney General from revisiting a decision not to seek the death penalty; the only apparent limitation is the notice provision of 18 U.S.C. § 3593(a).

## B. Nature of the Charges

Both capital and non-capital charges are contained in the indictment. The capital charges stem from the alleged murders of (1) Eric Smith ("Smith"), (2) Karon Clarrett ("Clarrett"), (3) Dwayne Thomas ("Thomas"), and (4) Troy Singleton ("Singleton").[4] On November 2, 2004, the grand jury indicted Brown and Crosby for Smith's murder; the crime was charged as a murder in aid of racketeering under 18 U.S.C. § 1959. In respect to Brown, the Government's theory, though not alleged in the indictment, is that she is guilty as an aider and abettor because she conducted surveillance in connection with the murder. *See* Government's Mem. of Law in Opp. to Defs.' Pretrial Mot. at 14 ("BROWN is liable as an accomplice."); Letter from JaneAnne Murray (Mar. 23, 2005), at 1 ("According to the government, Ms. Brown's role consisted of her surveillance efforts of the victim in the days and minutes leading up to the shooting[.]").

---

[4] The non-capital charges allege racketeering under 18 U.S.C. § 1962; criminal use of a firearm under 18 U.S.C. § 924(c); narcotics offenses under 21 U.S.C. §§ 841, 846, and 856; and money laundering under 18 U.S.C. § 1957.

On January 18, 2005, the grand jury handed down a First Superseding Indictment, which (1) charged McGriff with the Smith murder, and (2) charged Wright with the Clarrett and Thomas murders.[5] Like the Smith murder, the Clarrett and Thomas murders were charged as violations of § 1959; in addition, the indictment alleged that the murders of Clarrett and Thomas violated 18 U.S.C. § 1512, which authorizes the death penalty for murder contributing to the obstruction of justice.

On June 23, 2005, the grand jury handed down a Second Superseding Indictment, which charged McGriff and Crosby with the Singleton murder under § 1959.

On January 13, 2006, the grand jury handed down a Third Superseding Indictment. It charged Mosley under § 1959 with the Smith and Singleton murders, thereby also making him eligible for the death penalty. In addition, it added a new theory with respect to the Smith and Singleton murders, charging all defendants except Wright with violations of 18 U.S.C. § 1958(a), which authorizes the death penalty for use of interstate facilities "with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value."

On March 10, 2006, the grand jury handed down a Fourth Superseding Indictment. It added the attempted murder of "Jane Doe" to the list of predicate offenses in the non-capital racketeering charges against McGriff, but did not alter the capital

---

[5]The First Superseding Indictment also added non-capital charges against Irving Lorenzo, Christopher Lorenzo, MI Records, Inc., IG Records, Inc., and Cynthia Brent. Of these defendants, Brent pleaded guilty on September 21, 2005, and the remaining four were acquitted on December 2, 2005, after a jury trial.

charges.

Up to this point, none of the indictments had specified any of the aggravating factors listed in 18 U.S.C. § 3592; however, on March 31, 2006, nine days after the Government filed its death-penalty notices, the grand jury handed down a Fifth Superseding Indictment, which is now the operative indictment. It did not add any new charges or alter the existing ones; it simply added a "Notice of Special Findings," which set forth the same factors in support of the death penalty for each defendant as contained in their respective death-penalty notices.[6]

## C. Events Leading to the Setting of the April 3rd Trial Date and the Filing of the Death-Penalty Notices

The first mention of a trial date came at a status conference on September 9, 2005. At that time, Chief Judge Korman set the trial for March 6, 2006; he stated, however, that it was "contingent" on the case proceeding as a non-capital case. *See* Tr. of Sept. 9, 2005, at 28; *see also id.* ("THE CLERK: So, March 6 is the jury selection and trial if it's a non-death penalty case."). Chief Judge Korman thought it was important to fix a trial date that far in advance "because in a multi-defendant case, it's hard to get everyone [together]." *Id.*

The Death Penalty Committee did not meet until January 12, 2006. *See* Letter from Carolyn Pokorny (Mar. 3, 2006), at 2. Two weeks later, Chief Judge Korman held a

---

[6]A second branch of defendants' motion to strike, which was filed prior to the Fifth Superseding Indictment, argued that the death-penalty notices violated the Indictment Clause of the Fifth Amendment because, at the time of the motion, the factors had not been not found by the grand jury and alleged in any previous indictment. Upon the filing of the Fifth Superseding Indictment, this branch of the motion to strike was withdrawn; therefore, the Court need not address this issue.

status conference to address the continued viability of the March 6th date. Two days before the conference, McGriff's learned counsel submitted a letter stating his position that trial should go forward as scheduled, and that he would "oppose any motion brought by the Government to adjourn the trial date," Letter from David A. Ruhnke (Jan. 24, 2006), at 1; he further stated that "any [death-penalty] decision reached between now and March 6 would constitute inadequate notice." *Id.*

At the conference, the AUSA stated that the U.S. Attorney's recommendation would "go down to Washington, if not today then tomorrow or Monday I am told." Tr. of Jan. 26, 2006, at 3. Based on that understanding, the recent indictment of Mosley as an additional co-defendant, and the Government's desire to try all the defendants together, the AUSA proposed "a modest adjournment," taking the position that "an early summer or a summer trial date" would allow adequate time for Mosley's counsel to prepare and for the Government to "have the death decisions for all of the defendants in hand." *Id.* at 4. As promised, McGriff's learned counsel opposed the request.

After considering the Government's reasons for the requested adjournment and the availability of counsel, Chief Judge Korman rescheduled the trial for April 3, 2006, as a *firm* date, on the "assumption that there's no death penalty." *Id.* at 20; *see id.* ("MR. RUHNKE: Your Honor, do we understand correctly that the April 3 trial date is a firm date and if the government hasn't gotten this decision by then, we're going – THE COURT: We're going. It's a non-death penalty case.").

Another status conference was held on February 16, 2006, after the case had been reassigned. In response to the Court's inquiry as to the status of the death-penalty

decision, the AUSA stated:

> When we last appeared before Judge Korman, I had hoped that we would be sending down our recommendation to Washington imminently. As of today it has not gone out yet.

Tr. of Feb. 16, 2006, at 4. When the Court inquired about the reason for the delay, the AUSA explained that "part of it is [when] the defense attorneys got in their [mitigation] memos . . . . [W]e got our most recent one in January, so I can't say that the delay has all been on the part of the government." *Id.* at 7-8. The January submission was apparently Crosby's, submitted on January 3, 2006; McGriff's was submitted the month before, on December 9, 2005, Wright's on September 26, 2005, and Brown's on August 31, 2005. Since Mosley was not indicted until January 13, 2006, the U.S. Attorney had presumably decided that it would no longer be fair to the other defendants to wait for a mitigation memorandum from Mosley before making her death-penalty recommendations.[7]

The AUSA also expressed her doubt that the death-penalty decision would be made by April 3rd. Having previously told the Court that the trial would take approximately three or four weeks , *see* Tr. of Jan. 26, 2006, at 11, she thought that "the next point in time when there are mutual dates that all the attorneys could try it is in October." Tr. of Feb. 16, 2006, at 6. Given the uncertainty of counsels' collective availability in the near future, the Court stated:

> We really should make our best efforts to adhere to the April date and you can tell the U.S. Attorney and Washington, whatever else you can do, if we cannot meet that date I can't say when this case is ever going to be tried and it is going to result I would suspect in a lot of severance situations, multiple

---

[7]Mosley never submitted a mitigation memorandum.

trials and just a mess.

*Id.* at 10. Counsel for McGriff, Crosby, Wright and Brown confirmed that they were ready to try the case on April 3rd; Mosley's counsel promised to do "whatever [he] could" to be ready for trial on April 3rd, but wasn't "certain that [he would] be able to do that." *Id.* at 11.

A further status conference was held on March 3, 2006. In the interim, the U.S. Attorney had sent her death-penalty recommendations to Washington on February 24, 2006. Just prior to the status conference, the Government submitted a letter request for "a modest adjournment of the trial from April 3 to May 1, 2006, to permit sufficient consideration of the death penalty issues by the Department of Justice's Capital Crimes Unit." Letter from Carolyn Pokorny (Mar. 3, 2006), at 1. After listening to the scheduling problems of all the attorneys, and, in particular, that Wright's attorney was scheduled to start a multi-month trial on May 8th before Judge Garaufis, the Court concluded that abandoning the April 3rd trial date meant "a delay of many, many months." Tr. of Mar. 3, 2006, at 9. Although the AUSA suggested that Wright's case could conceivably be severed because he was "charged with two homicides that no one else [was] charged with," *id.* at 11, Wright's counsel wished to adhere to the April 3rd date; since the AUSA had estimated that the trial could be concluded in about three weeks, he had no need to seek a severance if the case were to proceed to trial on that date. Counsel for McGriff, Crosby and Brown also reiterated their desire and readiness to adhere to the April 3rd trial date; Mosley's counsel expressed his continued concern as to whether he would be prepared to proceed to trial at that time, or at any date in the near future.

11

After carefully listening to all parties, and acknowledging that it was confronted with a "delicate balancing act" of competing concerns, *id.* at 10, the Court denied the Government's request for a further adjournment:

> Let's go forward with [the April 3] date. You'll have to tell Washington that's what we're doing . . . . I'm not making an irrational judgment, I'm adhering to what Judge Korman initially set down.

*Id.* at 14. In doing so, the Court recognized the impossibility of accommodating all parties. *See id.* at 17 ("I'm trying to accommodate everybody. I can't do it.").

On Friday, March 17, 2006, the Attorney General's Committee invited defense counsel to travel to Washington to make mitigation presentations, which they did on the following Monday and Tuesday, March 20th and 21st. On March 21st, the Attorney General authorized the U.S. Attorney to seek the death penalty for all five defendants; as noted, the death-penalty notices were filed the following day. In the notice for McGriff, the Government expressed its intent to seek the death penalty for his alleged role in both the Smith and Singleton murders. As aggravating factors for each of those murders, the notice alleged that McGriff had

- "procured the commission of the offense by payment";

- "committed the offense after substantial planning and premeditation"; and

- "previously been convicted of engaging in a continuing criminal enterprise,"

Notice of Intent to Seek the Death Penalty (McGriff), at 2, 5 (citing 18 U.S.C. § 3592(c)(7, 9, 12)); with regard to the Smith murder only, the notice alleged the additional

statutory aggravating factor that McGriff had "knowingly created a grave risk of death to one or more persons in addition to the victim." *Id.* at 2 (citing 18 U.S.C. § 3592(c)(5)). As to non-statutory factors, the Government gave notice of its intent to prove, with regard to both murders, the impact on the victims' families and friends, and McGriff's risk of future dangerousness. *See id.* at 3, 5-6.

## DISCUSSION

Although § 3593(a) provides that a death-penalty notice must be given "a reasonable time before the trial or before acceptance by the court of a plea of guilty," it affords no guidance as to how to assess reasonableness, nor does it address the remedy to be fashioned if reasonable notice is not given; moreover, there is no legislative history addressing those issues.[8] There is, however, a small body of reported case law that provides valuable source material to aid the Court in constructing what it believes to be the proper analytical framework for resolving each of these issues.

---

[8]On March 29, 2006, Representative Louie Gohmert of Texas proposed the Death Penalty Reform Act of 2006, H.R. 5040, 109th Cong. (2006). The bill, which is now under consideration by the House Judiciary Committee's Subcommittee on Crime, Terrorism and Homeland Security, would, among other things, amend § 3593(a) to provide that

> [t]he notice [of intent to seek the death penalty] must be filed a reasonable time before trial or before acceptance by the court of a plea of guilty. *The court shall, where necessary to ensure adequate preparation time for the defense, grant a reasonable continuance of the trial.*

H.R. 5040, § 4(1)(B) (emphasis added).

## A. Existing Case Law

In *United States v. Colon-Miranda*, 985 F. Supp. 31 (D.P.R. 1997), the Government had filed death penalty notices for all the defendants, withdrew them, and then, changing its mind months later, sought to refile as to some of the defendants; in doing so, it scheduled a hearing before the Attorney General's Committee two weeks before the trial date. *See id.* at 33. Judge Fusté of the District of Puerto Rico refused to adjourn the trial date since any notice of intent that might thereafter be filed would necessarily be unreasonable because of "the prejudice that defendants would suffer as a result of the government's vacillation," *id.* at 35; thus, he held that the trial would proceed as non-capital cases against all defendants. *See id.* at 36.

In reaching that conclusion, Judge Fusté "look[ed] for guidance in the constitutional jurisprudence surrounding the Sixth Amendment right to a speedy trial." *Id.* at 35. Based on that jurisprudence, he reasoned that

> the determination of what constitutes "a reasonable time" must balance such factors as: The length of time between the notice of intent to seek the death penalty and the trial or plea; the reason for any delay; the nature of the government's conduct; and the prejudice to defendant from delay.

*Id.* (citing, *inter alia, Barker v. Wingo*, 407 U.S. 514 (1972)).

One week before the trial date, the Attorney General re-authorized the death penalty for those defendants under reconsideration. Not surprisingly, Judge Fusté adhered to his prior ruling. *See United States v. Colon-Miranda,* 985 F. Supp. 36, 40 (D.P.R. 1997). He also used the occasion to explain why a continuance or severance would not be appropriate:

The government has had months to revive its notice to seek the death penalty. We simply cannot postpone this trial for several months to allow defense counsel to prepare for a capital case when this case has been scheduled for months and the government did not bother to announce its actual intention to seek the death penalty until the eleventh hour. Basic due-process principles of speedy trial jurisprudence and judicial economy persuade us not to exercise our discretion to continue or sever the case.

*Id.* at 39.

*Colon-Miranda* was the only reported case interpreting § 3593(a) until 2003, which ushered in a flurry of decisions. In *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71 (D.P.R. 2003), Judge Fusté, relying on his analysis in *Colon-Miranda*, struck a death-penalty notice filed less than 24 hours before a defendant was scheduled to plead guilty. *See id.* at 87. Six months earlier, the Fourth Circuit confronted the statute in *United States v. Ferebe*, 332 F.3d 722 (4th Cir. 2003); to date, it is the only circuit court to have weighed in on § 3593(a)'s notice requirement. There, the death-penalty notice was filed five weeks before the trial date. *See id.* at 726. The district court applied *Colon-Miranda*'s speedy-trial analysis, but determined that the timing of the notice had not prejudiced the defendant and, therefore, denied the defendant's motion to strike. *See id.* at 730.

Writing for a 2-1 majority, Judge Luttig held that the circuit court had jurisdiction to review the district court's order under the collateral-order doctrine. *See id.* at 726. Turning to the merits, Judge Luttig viewed § 3593(a)'s notice requirement as *"prophylactic,"* and held that "the statute must be interpreted to require an inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of the charged offense and the anticipated nature of the

defense." *Id.* at 727 (emphasis in original). Thus, he rejected any notion of actual prejudice

because "relying on a prejudice inquiry to vindicate the right created by section 3593(a)

. . . incorrectly substitutes a post-trial, harmless error inquiry for the inquiry into pre-trial,

objective reasonableness mandated by the statute." *Id.* at 730. As Judge Luttig explained:

> Prejudice in [this] sense . . . is akin to harmless error. And, of
> course, the harmlessness of an error is determined (and
> necessarily so) only *after* an antecedent conclusion that there
> was in fact an error committed. To inform resolution of the
> question of whether the statute has been violated by a
> prejudice inquiry is, pure and simple, to confuse the question
> of harmlessness with the question of violation.

*Id.*

Judge Luttig then set forth the basic factors to be considered in lieu of actual

prejudice to determine whether a death-penalty notice was filed an "objectively

reasonable" time before trial to allow for the preparation of a death defense:

> To judge an accused's challenge to the reasonable timeliness of
> a Death Notice requires evaluation of, among other factors that
> may appear relevant, (1) the nature of the charges presented in
> the indictment; (2) the nature of the aggravating factors
> provided in the Death Notice; (3) the period of time remaining
> before trial, measured at the instant the Death Notice was filed
> and irrespective of the filing's effects; and, in addition, (4) the
> status of discovery in the proceedings.

*Id.* at 737.

With regard to the third factor, Judge Luttig noted that "[i]f *no* date of trial

is identifiable, then the interval between the date of filing and that yet unknown and

unidentified date cannot be measured. And if the interval cannot be measured, then the

court cannot reach conclusions, as the statute requires, about the objective reasonableness

of that interval." *Id.* at 738 (emphasis in original). The court was unable to determine the objective reasonableness of the notice at issue because "[t]he record d[id] not clearly reveal whether, at the instant the Death Notice was filed, a date existed on which Ferebe's trial was set to begin." *Id.* at 738.[9] Accordingly, the case was remanded to enable the district court to clarify whether it had established a firm trial date and, if so, to apply the objective reasonableness standard.

In dissent, Judge Niemeyer believed that the circuit court lacked jurisdiction to hear the interlocutory appeal because in his opinion "the guide for determining a 'reasonable' time must focus on the preparation denied or adversely affected by a notice allegedly given late." *Id.* at 748 (Niemeyer, J., dissenting). Given this view, the case was not meet for interlocutory review since "ultimately the adverse effect of preparation can only be measured by the defense that the defendant presented at trial." *Id.*

In making that post-trial assessment, Judge Niemeyer believed that the prejudice prong of the speedy trial analysis would have its place, and set forth the following factors that he thought should govern such post-trial determination:

> I would conclude that a court should at least consider (1) the nature of the charges made in the indictment; (2) the nature of the aggravating factors provided in the death penalty notice; (3) the period of time before trial that the notice was received by the defendant; (4) any actual notice that the defendant had received before the formal notice was filed and the extent to which the defendant was able to prepare based on that notice;

---

[9]The district court had scheduled the trial for September 10, but had "suggested that the postponements [of pre-trial hearings and conferences had] had the *practical* effect of cancelling the September 10 trial date." *Ferebe*, 332 F.3d at 738 (emphasis in original). This statement, said Judge Luttig, "cast doubt on whether that date in fact remained fixed." *Id.*

and (5) the prejudice that the timing of the formal notice has on the defendant's preparation for trial and on his presentation of the defense.

*Id.*

Judge Luttig, in reiterating that prejudice had no place in his objective reasonableness analysis, rejected all analogies to speedy-trial claims. First, he noted that the speedy-trial right "is unique in that it belongs to *both* the defendant *and* society," while § 3593(a) "provides a guarantee only to the criminal defendant." *Id.* at 734 (emphasis in original). In addition, because "[d]elay is not an uncommon defense tactic," *Wingo*, 407 U.S. at 521, a deprivation of the right to a speedy trial "may work to the accused's advantage," *id.*; to Judge Luttig, "it [was] not even arguable" that lack of adequate notice of intent to seek the death penalty might benefit the defendant. *Ferebe*, 332 F.3d at 734-35. Finally, referring to the Supreme Court's statement in *Barker v. Wingo* that "the right to speedy trial is a more vague concept than other procedural rights," in that one cannot "definitely say how long is too long in a system where justice is supposed to be swift but deliberate," 407 U.S. at 521, Judge Luttig hypothesized that such vagueness "inheres in rights that simultaneously protect multiple opposing interests," *e.g.*, swiftness and deliberateness; and that the right embodied in § 3593(a) was not such a right. *Ferebe*, 332 F.3d at 735. Based on these differences, Judge Luttig reasoned that the balancing test applicable to speedy-trial claims – and the prejudice inquiry that goes with it – was a poor means for measuring the objective reasonableness of the time between the filing of a death-penalty notice and trial. *See id.*

Despite their differences as to when and how the reasonableness of notice is

to be assessed, there is a small patch of common ground between the two opinions in *Ferebe*. Both Judge Luttig and Judge Niemeyer agreed that, whether applying the former's pre-trial "objective reasonableness" test or the latter's post-trial prejudice inquiry, the analysis must take into account (1) the nature of the charges, (2) the nature of the aggravating factors, and (3) the time between the filing of the notice of intent and trial. *See id.* at 737 ("Notwithstanding the dissent's fundamental disagreement with the court over the proper interpretation of section 3593(a), the first three factors it identifies as informing the inquiry into the reasonableness of the timing of the notice can, roughly, be legitimately encompassed within the objective inquiry that is mandated by the statute.").

Because the majority was unable to determine whether the death-penalty notice was filed an objectively reasonable time before trial, *Ferebe* contains no express holding on the issue of remedy. Judge Luttig stated, however, that the timing of a death-penalty notice must be assessed "as of the moment of the Death Notice's filing, and *irrespective of that filing." Id.* at 737 (emphasis added). Judge Niemeyer noted that this would "present the district court, in effect, with only the options of striking the notice or not striking the notice," *id.* at 749 (Niemeyer, J., dissenting), and, therefore, would "den[y] the court any flexibility in managing the period of trial preparation by scheduling or postponing trial to give the defendant a reasonable time to prepare." *Id.* He did not, however, explain how the district court would determine prior to trial whether a continuance would be required, commenting only that "a violation of § 3593(a) can be remedied by an array of responses." *Ferebe*, 332 F.3d at 747 n.1 (Niemeyer, J., dissenting).

Several district courts bound by Fourth Circuit precedent have had to apply

*Ferebe.* On remand in that case, the district court calculated that the trial was firmly scheduled to begin 39 days after the filing of the death-penalty notice, and held that, considering the requisite objective reasonableness factors, such an interval was "not enough time for Ferebe to have prepared his death defense." *United States v. Ferebe,* 2005 WL 1429261, at *8 (D. Md. June 16, 2005). Similarly, the Southern District of West Virginia held that 36 days' notice was unreasonable in *United States v. Hatten,* 276 F. Supp. 2d 574 (S.D. W.Va. 2003). By contrast, the Eastern District of Virginia has found intervals of three to four months to be objectively reasonable. *See United States v. Ponder,* 347 F. Supp. 2d 256, 270 (E.D. Va. 2004) (at least three months); *United States v. Cuong Gia Le,* 311 F. Supp. 2d 527, 534-35 (E.D. Va. 2004) (113 days); *see also United States v. Breeden,* 366 F.3d 369, 375 (4th Cir. 2004) (approving district court's determination that slightly more than six months' notice was reasonable).

The district courts bound by *Ferebe* have uniformly interpreted Judge Luttig's holding to mean that "delaying the trial date is not a remedy for an untimely Death Notice," *Hatten,* 276 F. Supp. 2d at 579 n.4; consequently, "[a] Death Notice filed an objectively unreasonable period of time prior to trial . . . must be stricken." *Ponder,* 347 F. Supp. 2d at 263; *see also Cuong Gia Le,* 311 F. Supp. at 532 ("[A]n untimely Death Notice cannot be rescued by delaying the trial date.").[10]

---

[10]Testifying in support of the proposed amendment to § 3593(a), *see supra* note 8, the head of DOJ's Capital Crimes Unit stated that the amendment would legislatively overrule "the *Ferebe* rule[, which] could result in the dismissal of a death notice." *Hearing on H.R. 5040 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. of the Judiciary,* 109th Cong. (2006) (statement of Margaret P. Griffey, Chief, Capital Crimes Unit, Criminal Div., Dep't of Justice), *available at* 2006 WLNR 5404524 (Mar. 31, 2006).

Two district courts outside the Fourth Circuit have had occasion to examine *Ferebe*. In *United States v. Wilk*, 366 F. Supp. 2d 1178 (S.D. Fla. 2005), the court applied the *Ferebe* factors and held that six months between the filing of the notice and the scheduled start of trial was objectively reasonable. *See id.* at 1185. The court also confirmed that the post-*Ferebe* case law in the Fourth Circuit stands for the proposition that "a court cannot continue a case for the purpose of allowing the government to file a timely Death Notice." *Id.* at 1184. Although the court found the notice to be reasonable under *Ferebe*, it also held that there was no possible prejudice because the defendant had agreed that six month's notice was reasonable. *See id.* at 1189. In doing so, it opined that "the better-reasoned position includes a prejudice analysis," and questioned whether the Eleventh Circuit would "adopt a standard that does not take into account the issue of prejudice to the Defendant." *Id.* at 1189.[11]

In *United States v. Pepin*, 367 F. Supp. 2d 315 (E.D.N.Y. 2005), Judge Weinstein of this Court summarily rejected *Ferebe*, questioning the majority's disapproval of a prejudice-based analysis and categorically dismissing as "unpersuasive" *Ferebe*'s "suggestion that a court may not effectively address the concerns raised by a motion to strike a death notice as untimely by postponing the trial." *Id.* at 318. In any event, Judge Weinstein concluded that a postponement was in order in the case before him because, despite a nominal trial date, "the parties were at all times aware that this matter would not proceed to trial unless both parties were fully prepared to go forward." *Id.* at 319.

---

[11]McGriff's learned counsel advised the Court during the April 7th oral argument that *Wilk* is currently on appeal, and that the Eleventh Circuit heard oral argument last week.

In sum, the existing cases divide on both issues now confronting the Court. With regard to the proper test for determining whether a death-penalty notice was filed a "reasonable time before the trial," as required by § 3593(a), Judge Fusté and Judge Niemeyer (with a nod of approval from the Southern District of Florida) espoused the view that, as with speedy-trial claims, the proper inquiry balances competing interests, with particular emphasis on prejudice to the defendant. Judge Luttig (and the courts bound by his majority opinion) have held that the proper test is one of "objective reasonableness," rejecting the notion that prejudice has any role to play in that assessment. Although Judge Luttig and Judge Fusté disagreed on the proper standard, they agreed that the issue should be addressed before trial, while Judge Niemeyer took the position that the timeliness of a death-penalty notice could only be assessed after trial.

With regard to the proper remedy, the divide is less explicit, but present nonetheless. Judge Fusté was obviously of the opinion that striking the death-penalty notice pre-trial can be a proper remedy for a violation of § 3593(a). *See Gomez-Olmeda*, 296 F. Supp. 2d at 87. The district courts in the Fourth Circuit, following and interpreting *Ferebe*, have taken it a step further and have held that striking the notice is the *only* proper remedy. Judge Weinstein disagreed and posited that a court may "effectively address the concerns raised by a motion to strike a death notice as untimely by postponing the trial." *Pepin*, 367 F. Supp. 2d at 318. Somewhere in the middle is Judge Niemeyer, who believed that district courts should have some "flexibility in managing the period of trial preparation by scheduling or postponing trial," *Ferebe*, 332 F.3d at 749, but did not explain how that flexibility should come to pass given his view that the violation of the statute

could only be assessed after trial.

## B. The Court's Approach

### 1. *Standard for Reasonable Notice*

With regard to the first issue, the Court agrees with Judge Luttig's conclusion that the notice requirement of § 3593(a) "must be interpreted to require an inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself." *Ferebe*, 332 F.3d at 727. As he cogently explained, the competing approach of asking whether the timing of the notice actually prejudiced the defendant "confuse[s] the question of harmlessness with the question of violation." *Id.* at 736.

Moreover, if actual prejudice were to be the determinant, it could, as Judge Neimeyer correctly reasoned, "only be measured by the defense that the defendant presented at trial," *Ferebe*, 332 F.3d at 748 (Niemeyer, J., dissenting). Under that standard, it logically follows that it would be conceptually impossible for a district court to determine prior to trial whether the defendant would be entitled to a continuance; Judge Neimeyer's passing reference to affording district courts flexibility to make that determination is simply counterintuitive since the district court could not then know whether the statute had been violated. Moreover, there are practical reasons weighing against the post-trial assessment of whether the statute has been violated; to conduct a capital trial only to strike the death-penalty notice afterwards would be a colossal waste of time, effort and expense for both litigants and the courts.[12]

---

[12]A plausible argument could also be made that the defendant should be retried before a non-death qualified jury, which would have the added virtue of allowing counsel's focus and resources to be devoted exclusively to the underlying charges.

Therefore, to the extent prejudice should be considered at all, it must be limited to an assessment of *potential* prejudice. *See, e.g., Colon-Miranda*, 985 F. Supp. at 35-36 (conducting prejudice inquiry, but before trial, when any prejudice is still only potential). However, the most sensible formulation of the standard for potential prejudice is part and parcel of Judge Luttig's "objective reasonableness" formulation, which simply asks "whether sufficient time exists following notice and before trial for a defendant to prepare his death defense." *Ferebe*, 332 F.3d at 737.

The Court also rejects Judge Niemeyer's notion that a court should consider "actual notice that the defendant had received before the formal notice was filed and the extent to which the defendant was able to prepare based on that notice." *Ferebe*, 332 F.3d at 748 (Niemeyer, J., dissenting). Defendants are on notice of their eligibility for the death penalty from the moment they are charged with a capital offense; § 3593(a) plainly contemplates more than that. Defense counsel should not be required to expend the time and resources required to mount a death defense until the Government gives notice that it actually intends to seek the death penalty.

Having decided that actual prejudice and actual (but not formal) notice are *not* proper factors bearing upon objective reasonableness, the Court believes that all of Judge Luttig's factors make sense, with one qualification: It is unlikely that a firm trial date would be fixed by the court if significant discovery remained; therefore, it is difficult to understand how the status of discovery would enter into the mix as a separate factor. In any event, as Judge Luttig recognized, other factors "may appear relevant," *id.* at 737; thus, there may be other considerations in a particular case to assist the Court in objectively

assessing whether the defendant had sufficient time to prepare his death defense, in the absence of a continuance, after receiving the death-penalty notice.

## 2. *Remedy for Unreasonable Notice*

Although the statute is silent with respect to remedy, there are only two possibilities that would ensure that a defendant would not be compelled to defend against the death penalty without adequate notice: striking the notice or granting a continuance. In the Court's view, either may prove to be the appropriate remedy in a given case; thus, the Court rejects both the extreme view, followed in the Fourth Circuit, that "an untimely Death Notice cannot be rescued by delaying the trial date," *Cuong Gia Le*, 311 F. Supp. at 532, and the equally extreme view that striking an untimely death-penalty notice is never appropriate; neither balances the importance of providing sufficient time for the Government to make a reasoned decision against the consequences to the defendant while he awaits his fate.

In striking that balance, the Court believes that the question posed in *Barker v. Wingo* in assessing the right to a speedy trial – "how long is too long in a system where justice is supposed to be swift but deliberate," 407 U.S. at 521 – while not being particularly relevant, as Judge Luttig points out, to the notice issue, *is* relevant to the remedy issue. As with speedy-trial claims, therefore, the Court should consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530.

The first factor – the length of the delay – is straightforward. It bears noting, however, that while the relevant interval with respect to the issue of objective

reasonableness is the time between the filing of the death-penalty notice and trial, the relevant interval at the remedy stage starts when the defendant becomes eligible for the death penalty and ends with the filing of the notice.

As for the second factor – the reasons for the delay – the Court should consider delays attributable to both the defendant and the Government. *Cf. McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003) ("[D]elay attributable to the defendant's own acts or to tactical decisions by defense counsel will not bolster defendant's speedy trial argument."). "[D]ifferent weights should be assigned to different reasons." *Wingo*, 407 U.S. at 531:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Id.* (footnote omitted).

As for the third factor – the defendant's assertion of his right – a defendant who has acquiesced in a protracted decision-making process has a less compelling claim to strike an untimely notice than a defendant who has consistently pressed the Government to make a prompt decision. *Cf. Wingo*, 407 U.S. at 532 ("[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.").

Lastly, although actual prejudice to the defendant's ability to prepare a death defense is irrelevant to the objective reasonableness inquiry as to whether the statute was

violated, a different type of prejudice is relevant to the issue of remedy; in that regard, prejudice relates to the burdens visited upon the defendant by the delay of trial and the attendant death-penalty sword that has lingered over his head.

### 3. *Summary of the Court's Approach*

In sum, to decide whether § 3593(a)'s notice requirement has been violated, the Court must determine – based on the nature of the charges, the nature of the aggravating factors, and the time remaining before a firm trial date – whether the defendant has been given an objectively reasonable amount of time to prepare a death defense. If not, then the Court must determine the proper remedy – either striking the notice or granting a continuance – by considering the length of the delay, the reasons for the delay, the defendant's assertion of the right to a timely adjudication of the charges, and the prejudice suffered by the defendant because of the delay. The Court's ultimate goal should be to choose the remedy that allows the Government to decide whether to seek the death penalty with adequate deliberation, but without unduly compromising the fair administration of justice.

### C. Application to Present Case

### 1. *The Notice Was Not Filed an Objectively Reasonable Time Before Trial.*

The first issue merits little discussion. By the time the Government filed its death-penalty notice against McGriff on March 22, 2006, only 12 days remained until the April 3rd trial date. The Court has no difficulty concluding that 12 days is not an objectively reasonable amount of time to prepare for a capital case.

The first two relevant factors in assessing the notice issue – the nature of the

capital charges and of the aggravating factors alleged in the death-penalty notice – confirm that conclusion. While the Court doubts that 12 days would ever be adequate notice in even the most straightforward homicide prosecution, the capital charges against McGriff are complex, stemming from his alleged role as the head of an extensive and ongoing criminal enterprise that had solicited the murders; regarding the aggravating factors, the Government intends to prove that both murders were, in essence, murders for hire that involved extensive planning and preparation, and with regard to the Smith murder, a grave risk of death to others. Twelve days is simply not enough time to prepare a death-penalty defense under these circumstances.

With regard to the third factor, the Government contends that the April 3rd date was not a firm one and claims that all parties and the Court understood that a continuance would be forthcoming if death notices were filed. The record belies that contention. Both Chief Judge Korman's and my statements at the various status conferences reflect that, although sensitive to the time a decision might take in a five-defendant case, we were both increasingly concerned about continued delay. By the time of the January 26th conference, it was clear that whatever decision the Government might subsequently make, trial was scheduled to begin on April 3rd.

## 2. The Proper Remedy for the Untimely Notice is Severance and Continuance.

The factors relevant to the remedy issue require the Court to deny McGriff's motion to strike the death-penalty notice, and to order a severance and continuance.

Regarding the length of the delay, credible statistics disclose that the average interval between death-penalty eligibility and the filing of a death-penalty notice is

approximately eight months.[13] In McGriff's case, the interval was somewhat above average (9 months) with respect to Singleton's murder and significantly above average (14 months) with respect to Smith's; thus, this factor weighs slightly in McGriff's favor.

With regard to the reasons for the delay, analysis is aided by dividing the delay into three stages: (1) the time between the indictments for the Smith and Singleton murders and the time when the Death Penalty Committee met on January 12, 2006; (2) the time between that meeting and the U.S. Attorney's recommendation to the Attorney General on February 24, 2006; (3) the time between that recommendation and the filing of the death notice on March 22, 2006.

As for the first stage, the Government posits two justifications for the passage of these periods of time: (1) that there was an ongoing investigation into McGriff's role as the alleged leader of the criminal enterprise and his connection to the murders giving rise to the capital charges; (2) that, because it adheres to a practice of evaluating death-eligible co-defendants together, the U.S. Attorney waited until all defendants (except for the recently indicted Mosley) had submitted their mitigation memoranda before making her recommendations. *See* Government's Mem. of Law in Opp. to Defs.' Mot. to Dismiss Notices of Intent to Seek the Death Penalty at 26-27.

In respect to the first justification, the Government's representation that its investigation of McGriff was ongoing is borne out by the Second Superseding Indictment

---

[13]The statistics are derived from raw data compiled by the Capital Defense Network ("CDN"). *See* CDN, Preparation Time Permitted Defense Counsel in Authorized Capital Prosecutions, http://www.capdefnet.org/fdprc/contents/shared_files/docs/time.htm (last visited Apr. 11, 2006).

of June 23, 2005, which added the Singleton murder to the capital charges against McGriff and Crosby; and more recently, by the Third Superseding Indictment of January 13, 2006, which, in addition to implicating Mosley in the Smith and Singleton murders, alleged that those murders had been procured by payment. The Court has no reason, nor has any been proffered, to question the *bona fides* of this representation.

However, the second justification gives the Court some pause because it holds an individual defendant who has expeditiously submitted his or her mitigation statement hostage while the Government waits for the other submissions. A good example of the unfairness of this approach to a particular defendant is reflected in Brown's case: She has been held without bail since first indicted on November 2, 2004, as an aider and abettor for conducting surveillance in connection with the Smith murder; apparently no new facts pertaining to her role have since surfaced. Moreover, she submitted her mitigation statement on August 31, 2005, and has persisted in wanting to go to trial. There appears to be no reason why there could not have been a more expeditious death penalty determination as to her; in addition to the obvious fairness to this defendant, who, after submitting her mitigation statement had to wait more than seven months before learning that the Government would not attempt to put her to death, a more timely determination would have saved the needless expenditure of tax dollars for the services of learned counsel, and would have aided the court in its administrative responsibilities.[14] Notably,

_____

[14]Relying in part on Brown's alleged marginal role in the Smith murder, and the Attorney General's sudden withdrawal of the death notices against all of McGriff's co-defendants, McGriff strenuously argues that the death notices were "shams" whose "true purpose was to buy time." Defs.' Supp. Joint Mem. of Law in Support of the Mot. to Dismiss the Notices of Intent to Seek the Death Penalty at 12-13. Although the Court

the U.S. Attorney – apparently recognizing that the Court would no longer allow the Government's preference to wait until all defendants filed mitigation statements before making any recommendations to trump the rights of individual defendants – did not further prolong the decision-making process by waiting for a mitigation statement from Mosley.

Nonetheless, McGriff is not in the same posture as Brown, whose circumstances might very possibly have tipped the balance in favor of striking her death notice had it not been withdrawn. McGriff is responsible for a good portion of the time it took the U.S. Attorney to make her recommendations, as his mitigation memorandum was not filed until December 9, 2005, almost 11 months after he was first indicted. The Death Penalty Committee met just one month later. Certainly, the Government cannot be faulted for not making a recommendation as to McGriff until it had received his mitigation statement.

However, McGriff bears no responsibility for the approximately six weeks that elapsed during the next stage – the time between the Death Penalty Committee's meeting and the U.S. Attorney's recommendations. Although no reason has been offered for this delay, the Court cannot say that it was inherently unreasonable, although it did

---

is troubled by the Attorney General's indecisiveness in these matters of life and death, it cannot serve as a basis for striking McGriff's death-penalty notice. *See United States v. McVeigh*, 944 F. Supp. 1478, 1484 (D. Colo. 1996) ("[T]he decision to seek the death penalty under the Act is a matter of prosecutorial discretion."); *Walker v. Reno*, 925 F. Supp. 124, 128 (N.D.N.Y. 1995) ("[T]he Attorney General's decision whether or not to seek capital punishment in a particular prosecution is a presumptively unreviewable action firmly 'committed to agency discretion as a matter of law' within the meaning of [the Administrative Procedures Act].").

prevent the Attorney General from having 45 days to make his decision, as contemplated by his protocols.

The final stage lasted just a month. This was not too long a period of time for the Attorney General to give the full deliberation which the gravity of the decision warranted.

To the extent the last two factors – the defendant's demand for a prompt death-penalty decision and prejudice occasioned by the delay – weigh in favor of McGriff, they are counterbalanced by the late submission of McGriff's mitigation statement and the relatively reasonable period of time it subsequently took the Government to reach its decision. Moreover, with regard to the third factor, the record does not reflect that McGriff's learned counsel made any demands on the Government to speed up its decision-making process before January 24, 2006, when he took the position that any death-penalty notices filed thereafter would be untimely.[15]

Balancing the competing interests, the Court concludes that they do not warrant striking the death notice, thus leaving a continuance as the proper remedy for the untimely notice. After the Court rendered its oral decision on April 7th, McGriff's learned counsel requested such a continuance; the Court granted the request and severed McGriff's case so the other cases could proceed to trial on the scheduled trial date.

---

[15]At oral argument, McGriff's learned counsel contended that his delay in submitting his mitigation statement was the result of his misunderstanding that the decision-making process would go forward with or without it. It is counterintuitive for learned counsel to suggest that he would not promptly avail himself of the opportunity afforded by a mitigation statement to further his efforts to persuade the U.S. Attorney to recommend not seeking the death penalty against his client.

## CONCLUSION

McGriff's motion to strike the death-penalty notice is denied; his case is severed and a new trial date will be set. Trial against the other defendants will proceed as scheduled.

**SO ORDERED**.

FREDERIC BLOCK
United States Senior District Judge

Brooklyn, New York
April 13, 2006